Defendant-appellant Samuel Phillips appeals from his convictions for two counts of rape in violation of R.C. 2907.02, for having engaged in sexual conduct with the victim, not his spouse, by purposely compelling her to submit by the use of force, the victim being under age thirteen. The appellants motion to bifurcate repeat violent offender specifications, prior conviction specifications, and sexual predator specifications was granted. Subsequent to the jury's finding of guilt, the court found the appellant guilty of the bifurcated specifications, but referred for a pre-sentence investigation report. The court initially held the finding on the sexual predator specifications in abeyance pending further hearing.
On the day of sentencing, the court imposed a term of life in prison for each count of rape, to run concurrently with each other, plus an additional eight years on each count of rape for the repeat violence offender specification, to run consecutively with each other and consecutively to the life term in prison. Although the transcript is not contained in the record, the courts order of January 30, 1998, indicates that a hearing was held for the sexual predator specification. In the sentencing addendum, the court found the appellant to be a sexually oriented offender. Address registration and verification were ordered annually for ten years. The court further found the victim to be under the age of thirteen.
Mrs. Annie Payne lives on East 120th Street, Cleveland, Ohio, with three of her six daughters and eight of her grandchildren. Her daughter Sherry has three children, Shyanna(7), Marshay(5) and Shante(1). Daughter Jennifer has one child, Jacqueline, and daughter Tina Pittman has four children, Shanteer, Clarissa(13)[1], Clarence(11), and Stanley. Shanteer has a child, also in residence, named Diamond. Until two months preceding the trial, Sherry and her three children lived on Oakland Avenue, directly across the street from Mrs. Payne. The appellant formerly lived with Sherry, and is the father of her two youngest children.
On August 21, 1997, at ten or eleven o'clock at night, the appellant yelled across the street to Clarissa, who was sitting on her front porch with her cousin Felicia(15) and her brother Clarence, and requested that she watch his children while he went to the store for milk and pampers. At this time there was some playful talk that if the appellant did not return within five minutes that Felicia and Clarence would come and check on Clarissa (T. 267). The store is a three to five minute walk away from the home. Clarissa complied, and walked into the appellants house and went straight to the bathroom. The three younger children she was to watch were in the bedroom with the door shut. At the time Clarissa entered the house, the appellant was in the livingroom. Prior to the time Clarissa finished using the facilities, the appellant entered the bathroom. The appellant grabbed Clarissa and twice attempted to place his penis in her vagina; the third time he was successful. Clarissa was standing with her back to the bathroom door, attempting to fend off the appellant and pull up her pants.
During the assault, Shyanna came out of the bedroom and knocked on the bathroom door. Clarissa told Shyanna to "go get grandma" (T. 221), but the child could not hear her. The appellant told Shyanna to go back into the bedroom, an order with which the child complied. He ordered Clarissa to be quiet. Clarissa could smell alcohol on the appellants breath.
The appellant next grabbed Clarissa and dragged her into the front livingroom. He placed one arm around her waist and one over her mouth, her pants and underwear were still down. The appellant placed Clarissa on a couch/chair and performed cunnilingus. Clarissa attempted to evade the appellant, but was pushed back onto the couch.
The appellant ceased his activity when he noted that Clarence and Felicia were looking through a mailbox slot and knocking on the door. The couch/chair on which the appellant raped Clarissa could be seen through the mailbox slot. The appellant put his pants back on and picked up the baby, who was crying. Mrs. Payne then appeared and took Clarissa home. After questioning Clarissa, Mrs. Payne proceeded back across the street to remove all of the children from the home.
At the time of the rape, Clarissa's aunt Sherry was out with Martrice, a cousin. The appellant called her over approximately ten minutes after Sherry left for the evening. Clarissa's mother, Tina, was also at a friends house down the street that evening. Tina was sent for and returned home prior to the time the police arrived. The police came, and Clarissa was taken to University Hospital.
Felicia Carter, age 15, testified that she is Clarissa's cousin. Felicia lives with her on East 147th Street with her mother, Anita Carter. Anita is one of Mrs. Payne's daughters. Felicia testified that Sherry left at 10:00 or 10:30 that evening for a bar with Martrice Payne. Felicia and Clarissa were sent to telephone Martrice because the appellant informed Sherry that she could go out that evening. Felicia was at Sherry's house at approximately 9:30 p.m. and Sherry was lying down. At one point Clarissa and Felicia were talking on the porch and Clarissa jokingly stated that the appellant was about to rape her (T. 332). Clarissa left to babysit at approximately 11:00 p.m. Felicia observed Clarissa enter the appellants house, and after five to ten minutes she and Clarence walked across the street. They looked into the side window, but did not see anything. They heard and then saw Shyanna and Marshay go to the bathroom door. Shyanna called out and the appellant responded. The children went back into the bedroom. Felicia and Clarence went back to Mrs. Paynes home.
Felicia went to the appellants house a second time because Clarissa had been gone too long. Felicia went onto the porch and peered in the mail slot. She observed Clarissa sitting in a chair, the appellant was on his knees, and Clarissa's legs were over his shoulder (T. 300). Clarissa was wearing no clothing below the waist. The appellant ceased his activity when he heard the squeak of the mail slot.
On her way back across the street to tell her grandmother, Felicia passed Clarence. When Clarence learned what was happening, he ran to Sherry's house. Felicia located her grandmother upstairs in bed. When she informed her grandmother that the appellant was assaulting Clarissa, Mrs. Payne and Felicia returned to the appellants home. Clarence was there, attempting to enter the house. When the door opened, the appellant was standing there holding the one-year-old baby. Clarissa was standing right beside the appellant and looked nervous or scared. Mrs. Payne went back to her home and by the time she returned to the appellants house, he had vacated the premises. Felicia saw the appellant the next day at his place of employment, Popeye's, on Euclid and Superior.
Clarence Pittman, age 11, testified that he is Clarissa's brother. Clarence testified that Clarissa went to babysit between 10:00 and 11:00 p.m. His Aunt Sherry was not at home, but had gone out with his cousin Martrice. Sherry left about five minutes before Clarissa went to babysit. Clarence observed Clarissa enter the house of the appellant. After four or five minutes he and his cousin Felicia looked out the window. Since they did not observe the appellant leave his home, they went across the street and looked through the side window. They were able to observe nothing. The bathroom door was closed. He did see Shyanna exit the bedroom and stand next to the bathroom door. He could tell from the voices that the appellant was in the bathroom. The appellant ordered Shyanna back into the bedroom.
Clarence and Felicia went back across the street and waited another five minutes. Still no one came out the front door. Felicia headed back to the appellants house while Clarence looked for his shoes. He passed Felicia as she was running back. They exchanged words and Clarence went up onto the appellants porch and looked through the mail slot. He observed Clarissa in a chair with her legs over the appellants shoulders and the appellant, on his knees, had his face by her private parts. Clarissas pants and underwear were down by her ankles. Clarence was still on the front porch when Felicia returned with his grandmother. The appellant opened the door and Clarence asked him what he was doing to his sister? Mrs. Payne made the same type of inquiry. Felicia, Clarence, Clarissa and Mrs. Payne returned to Mrs. Paynes home. While Mrs. Payne questioned Clarissa, Clarence went back to confront the appellant. The appellant denied any wrongdoing. Mrs. Payne returned to the appellants house to remove the other children. Clarence was sent to find Tina, his mother. Clarence overheard the joking conversation between Felicia and Clarissa regarding the appellant and something about a rape (T. 388, 389).
Shyanna Payne, age 7, testified that she lives with her grandmother, Mrs. Annie Payne and "a whole bunch of people" (T. 449). She and her mother, the appellant and her two sisters used to live across the street from her grandmother. Shyanna remembers Clarissa coming over and using the bathroom. She and her sisters were in the bedroom. Shyanna testified that the appellant was also in the bathroom. When she exited her room and went to the bathroom door, the appellant told her she could not enter because he was using it right now. Shyanna was not sure whether or not anyone else was in the bathroom.
Mrs. Annie Payne testified that Sherry and her children moved into her home at the end of September 1997. The last time she saw the appellant was at approximately 10:30 or 10:45 at night. She went to the appellants house, across the street from hers, after her granddaughter Felicia came for her. She ran to Sherry's house in her nightgown, with no shoes or coat. Clarence was already there. The appellant was standing in the door, holding the baby, Clarissa was standing beside the appellant. Mrs. Payne asked the appellant what he had done, the appellant replied that he had done nothing. Clarence was attempting to hit the appellant with a brick, but Mrs. Payne held him back because of the baby. Clarissa was standing there as if dumbfounded. Mrs. Payne carried Clarissa across the street. Since Clarissa would not answer her questions, she slapped her, like you would someone in a daze (T. 470). Clarissa then proceeded to describe to her grandmother both of the rapes perpetrated on her by the appellant.
Mrs. Payne went back to the appellants house to collect the rest of her grandchildren. The appellant was not there, and Mrs. Payne was informed by one of the children that the appellant had fled. Mrs. Payne returned home and called the police, who arrived very quickly. Felicia and Clarence were carrying on, very upset. The police took statements and then conveyed Tina and Clarissa to the hospital. The family began a search for the appellant, but he disappeared and never returned. Mrs. Payne testified that she has legal custody of Clarissa, Clarence, Marshay and Stanley. Mrs. Payne testified that subsequent to the rapes, she received letters from the appellant. This letter expressed his wish that the charges be dropped.
Sherry Payne testified that she has three children, Shyanna (7), Marshay(5), and Shante(1). The appellant is the father of the youngest two. Sherry has five sisters, Gloria, Pamela, Anita, Jennifer and Tina. She and her children moved in with her mother in the beginning of October. Prior to this move, she and the appellant lived directly across the street from her mother.
Sherry visited the appellant in jail once. The appellant had been employed at Popeye's Chicken as a cook for a year. On the day in question, Sherry was at home when the appellant returned home after work with chicken, six to eight cans of beer and two nickel bags of marijuana. A few friends came over and at least two return trips to the store for beer were made. One trip was made to purchase more marijuana. The appellant and Sherry have been together for six years and she testified that when the appellant drinks and smokes marijuana he becomes "touchy-feely" (T. 504) All of the beer and marijuana were consumed, Sherry was high and went to bed at approximately 8:00 or 9:00 p.m. The appellant woke her up at 9:30 p.m. and told her he would prefer for her to go out that evening instead of the next because he had plans for them for the next evening. Sherry testified that she did not want to go out since she was already high. The appellant awoke her once more as he had sent Clarissa and Felicia to call Martrice. When Martrice arrived, they went to a bar named Easy. The appellant gave her thirty dollars. She was at the bar for an hour and one-half when she received a call from Felicia which prompted her to hasten home. When she arrived, at about 11:00 p.m., the appellant was no longer there, nor did he ever return. The next time Sherry saw the appellant he was in the county jail. For the five years Sherry and the appellant lived together, they shared a bedroom.
Sherry also received some correspondence from the appellant. In one of these letters the appellant stated: "I'm not going to make up excuses for what I did because it was wrong . . . . I can't explain what happened because I really don't remember what happened." (T. 513). In another letter the appellant requested that the charges be dropped because if not, he would be sentenced to life in prison (T. 515). Sherry testified that she was so upset she threw away the furniture; that through the mail box slot you could see right into the livingroom; and that the bedroom and bathroom doors are next to each other.
Cleveland Police Officer Nicole Jennings testified that she responded to the call in the vicinity of East 120th and Oakland on August 21, 1997. She and her partner spoke briefly with Tina Pittman and her daughter Clarissa. Subsequently, both were taken to Rainbow Babies and Childrens Hospital. When the officers arrived, Clarissa was very upset, distraught, and crying. The officers arrived within approximately ten minutes of Clarissa's arrival home. The officers remained at the hospital and collected evidence from the child's clothing and the rape kit. While at the hospital, Clarissa identified the appellant as the perpetrator. The officers returned to the crime scene and unsuccessfully attempted to locate the appellant.
Dr. James Wilde, M.D., board certified in pediatrics and in pediatric emergency medicine, testified that he is affiliated with Rainbow Babies and Children's Hospital. Late in the evening of August 21, 1997, he was working as the attending physician in the emergency department and provided care to Clarissa. Dr. Wilde identified the chart made for Clarissa and identified the notations he made on the chart. He recalled that both the patient and the mother were very tearful. Dr. Wilde explained that the residents do the primary documentation, but the attending physician also puts notes on the chart.
During his examination, Dr. Wilde asked Clarissa whether or not she was hurt, but he relied on the police to collect non-medical information regarding details and specifics of the attack. Dr. Wilde noted on the chart that the victim stated that she was attacked by a known male and stated that there was penetration to the vagina. The chart also indicates that the victim had an edematous hymenal ring, but there was no bleeding or bruising. Dr. Wilde explained that edematous means swelling and that there was swelling around the hymenal ring (T. 412-413). On the chart it states: "Impression: Acute sexual assault" (T. 413). Dr. Wilde explained that the word acute in "acute sexual assault" refers to the time period and means the recent past.
Where there is no history of sex, the hymenal ring is usually still intact. The doctor continued:
 With regard to a patient who has been sexually assaulted, a pediatric patient who has been sexually assaulted, the question arises about whether an intact hymenal ring means there was no penetration or not, and in the case of pediatric cases, actually, the answer, is, no. It doesn't mean it didn't occur. What it means is that there is no physical evidence that it occurred, and the lack of physical evidence does not rule it out.
(T. 415-416)
Dr. Wilde was asked by the prosecution:
 Q: Doctor, I might have said this, but I would ask you the question: Do you have an opinion, based upon a reasonable degree of medical certainty, as to what would have caused that acute — Im sorry — what would have caused the edema that you were looking at —
* * *
 A. Edema comes from a trauma, and based on the patients history, what she told us, and my physical exam, it is consistent with someone who has been sexually assaulted.
(T. 418)
On cross-examination the doctor again testified that the victims hymen is intact. He particularly recalled that the victim was very tearful (T. 421). On re-direct, the State followed the appellants line of questioning by inquiring as to whether an intact hymen precludes a child from being raped or penetrated. Dr. Wilde responded:
 A. No. No. In fact, there have been this is an issue that comes up in sexual assaults, particularly in kids, because there are some who would make the statement, "Well, if the hymen is intact, then they couldnt have been penetrated."
 In fact, there was the most recent study that Im aware of that examined this question, which was from 1989, where they looked only at cases where the perpetrator admitted to having penetrated the child's vagina. The studies were in kids from one to seventeen-years-old, and in 40 percent of those cases, there was nothing, on physical exam, that corroborated that the vagina had been penetrated.
 So — and theres several other studies of literature documenting the same thing that the lack of physical findings doesn't mean anything.
Q. Was the hymen still intact in those cases?
A. Yes, they were.
(T. 423.)
Prior to the commencement of trial, appellants counsel indicated that the appellant wished to personally address the court. With the courts permission the appellant stated:
 Mr. Phillips: I have a Motion to Dismiss the Complaint filed on 12/3/97. with regard to 2945.71, the defendant would request of this Court to dismiss the charge on the grounds of 2945.73(B), "Upon Motion made at or prior to the commencement of trial, a person charged with an offense shall be discharged if he is not brought to trial within the time required by Sections 2945.71 and 2945.72 of the Revised Code."
 The defendant was arrested on August 22nd, 1997. The time limit was over on November 22nd, 1997, and there was no reason to extend as provided in Section 2945.72.
 So the speedy trial limit is up, and I would like for the Court to dismiss all charges against the defendant
The Court: That motion will be overruled.
 As all parties are well aware in this case, there was a competency and a sanity report provided. This case was referred to the Psychiatric Unit, on October 16 for a sanity and competency report, and, on November 25th, the report was returned, and the Hearing was held relative to that.
 Therefore, almost 40 days tolled as a result of the referral to the Psychiatric Clinic.
 Therefore, this case is being tried within the Statutory period prescribed by law.
* * *
 Mr. Phillips: About the Psychiatric evaluation, I did not give my attorney permission
 I was trying to come into Court on that particular day, and I was going to have a Motion filed that I had back in the Chambers —
The Court: "In the Chambers"? You mean, in the cell?
 Mr. Phillips: In the cell, and he told me he would be back, but, at the time, I was under, you know, I was — I was under a big emotional goings on and he said that —
 The Court: Certainly, that was evident because Mr. Gaunter referred you, and the referral was appropriate —
Mr. Phillips: I didn't want it —
The Court: All right.
Mr. Phillips: thats why I was violated on that —
The Court: Thank you, Mr. Phillips.
The Motion will be denied.
(T. 10 — 14.)
The appellant asserts two assignments of error. The appellants first assignment of error:
 THE APPELLANT FAILED TO RECEIVE THE EFFECTIVE ASSISTANCE OF COUNSEL.
The appellant asserts in the first assignment of error that he was rendered ineffective assistance of counsel by counsels failure to object to the prejudicial hearsay medical testimony which established that an intact hymen in a child does not negate an allegation of rape.
Ineffective assistance claims are evaluated in a two-step process. First, the defendant must show that counsels representation fell below an objective standard of reasonableness.State v. Keenan (1998), 81 Ohio St.3d 133, 152, citing toStrickland v. Washington (1984), 466 U.S. 668. 688. Second, the defendant must show that there is a reasonable probability that, but for counsels unprofessional errors, the result of the proceeding would have been different. Id. See also State v. Davie
(1997), 80 Ohio St.3d 311, 331 and State v. Reynolds (1997),80 Ohio St.3d 670, 674. There is a strong presumption that licensed attorneys are competent and that the challenged action is the product of sound trial strategy. State v. Hamblin (1988), 37 Ohio St.3d 153. Even debatable tactics do not constitute ineffective assistance of trial counsel, for it is obvious that nothing is seen more clearly than with hindsight. State v. Clayton (1980), 62 Ohio St.2d 45, 49. A reviewing court must evaluate trial counsels performance on the facts of the particular case as of the time of counsels conduct. Strickland,supra.
In the case sub judice. assuming arguendo, that counsel improperly failed to object to the medical testimony, the appellant was not rendered ineffective assistance of counsel as it is not possible for the defendant to show that there is a reasonable probability that, but for counsels unprofessional errors, the result of the proceeding would have been different. A review of the facts show that there was overwhelming evidence of the appellants guilt. The victim was clear in her testimony as to both counts of rape; the second count was witnessed by both the victims cousin Felicia and her brother Clarence; the medical testimony revealed without question that the victims hymen suffered a trauma; and the medical finding was one of acute sexual assault. The details surrounding the events of the evening as given by Mrs. Annie Payne, Sherry Payne, and Shyanna Payne corroborated the victims account of her ordeal. Additionally, the letters written by the appellant both to Sherry Payne and to Mrs. Annie Payne could properly have been interpreted by the jury as indications of the appellants guilt.
The appellants first assignment of error is overruled.
The appellants second assignment of error:
 THE TRIAL COURT FAILED TO INQUIRE OF THE APPELLANT AS TO WHETHER OR NOT HE WAS SATISFIED WITH THE REPRESENTATION OF HIS COUNSEL.
In the second assignment of error, the appellant asserts that since he neither requested nor wanted a psychiatric evaluation, counsels request for the evaluation is indicative of such grave differences between the two that it was incumbent upon the court to inquire into the matter. The appellant points out that since he was filing his own motions, in addition to those filed by counsel, the court should have inferred a breakdown in the attorney-client relationship and inquire as to his satisfaction with counsel.
The record indicates that the appellant himself filed only one written motion, and that motion was for a transcript of the preliminary hearing. Prior to trial, the appellant was orally permitted to address the court and place on the record: 1) his motion to dismiss based upon the expiration of the statutory time in which trial must be brought; 2) a motion asserting that his failure to waive the preliminary hearing resulted in a violation of his Constitutional rights; and, 3) that his attorney requested a psychiatric evaluation without his consent. The crux of the appellants argument on the first and third motion, and on appeal, is that he did not consent to his referral to the psychiatric clinic for competency and sanity evaluations.
Under certain conditions a court has an affirmative duty to inquire, on the record, into a defendants complaints regarding the adequacy of appointed counsel. State v. Deal (1969), 17 Ohio St.2d 17. Where there is no evidence in the record which would alert a trial court that a defendant is dissatisfied with retained counsel, no inquiry is required. State v. Keith (1997), 79 Ohio St.3d 514,524.
Here, there are several reasons this court must overrule the appellants assignment of error. First, the record contains no statement given at the time of the referral that the appellant objected to the competency and sanity evaluations. Until the day of trial, the appellant failed to indicate to the court that he was unsatisfied with his counsel. Secondly, the appellant never requested that counsel be removed, nor complained that counsel was providing inadequate representation.
Thirdly, the courts order of December 16. 1997 stated:
 Defendant in court with counsel Tim Gaunter, Prosecutor Ralph Kolasinski also present. Hearing held, defendant found to be sane and competent. Trial remains set for December 15, 1997.
From this order it is evident that a hearing was held regarding the competency and sanity evaluations. The record before this court contains no transcript of this hearing, and this court must presume the regularity of the trial courts actions. Had there been reason for the court to inquire as to the appellants satisfaction with his counsel, this court must assume the trial court would have so inquired.
Finally, when the appellant addressed the court he admitted that "I was I was under a big emotional goings on . . ." The court responded: Certainly, that was evident because Mr. Gaunter referred you and the referral was appropriate. (T. 14). Thus, by his own admission, the referral to the psychiatric clinic was appropriate.
The appellants second assignment of error is overruled.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The Court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this Court directing the Common Pleas Court to carry this judgment into execution. The defendants conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
TERRENCE O'DONNELL, P.J., and
JOHN T. PATTON, J., CONCUR.
JAMES D. SWEENY, JUDGE
[1] Ages of the children are listed as testified to at trial. The victim, Clarissa Pittman (d.o.b. 11/19/84) was twelve at the time of the offenses, but was thirteen at the time of trial.